<u>NOT FOR PUBLICATION</u>

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | | |
|---|---|---|
| _____ : | | |
| SPANISH SPORTS NETWORK, LLC, et : al., | | |
| : | | |
| Plaintiffs, : | Civil No. 20-7354 (RBK/MJS) | |
| : | | |
| v. : | **OPINION** | |
| : | | |
| SPANISH FOOTBALL PRODUCTIONS, : LLC, et al | | |
| : | | |
| Defendants. | | |
| _____ | | |

**KUGLER**, United States District Judge:

Presently before the Court are Defendants William Kulik and Spanish Beisbol Productions, LLC, Motions to Strike under Rule 12(f) and Dismiss under Rule 12(b)(6). (Doc. No. 19). For the reasons set forth below, Defendants William Kulik and Spanish Beisbol Productions' Motion to Strike is **DENIED** and their Motion to Dismiss is **GRANTED** in part.

## I.   BACKGROUND

This case involves two competing radio media and broadcast production companies that are vying for the right to produce and air Spanish-language Eagles games. At one point in time these competitors were business partners and co-members of a limited liability company. However, as is common in two-person business ventures, their relationship soured and devolved into the present controversy.

### A.  Factual Background

Plaintiff Spanish Sports Network, LLC ("SSN") is a radio media and broadcast production company that develops sports content for Spanish radio listeners. (Doc. No. 1,

Compl. at ¶¶ 1, 20). Plaintiff Michael Sciore, the current owner and sole member of Spanish Sports Networks, owns several Spanish-language radio stations throughout the New Jersey and Philadelphia areas. (*Id.* at ¶¶ 5, 21). Defendant William Kulik, the former President and broadcaster for SSN, and Defendant Ray Devine allegedly own and operate several competing sports radio production companies called Spanish Sports Productions, LLC, Spanish Football Productions, LLC, and Spanish Beisbol Productions, LLC. (*Id.* at ¶¶ 6–13).

Mr. Sciore and Mr. Kulik's business relationship began in August of 2015, when Mr. Kulik—who at the time was producing Spanish-language radio broadcasts of Philadelphia Phillies and Eagles games through his companies Spanish Beisbol Network and Spanish Football Network—assigned SSN the right to produce these Spanish language radio broadcasts. (*Id.* at ¶ 25). Thereafter, Mr. Kulik became a member of SSN and served as its President and broadcaster, while Mr. Sciore, also a member of SSN, provided the capital for SSN to operate. (*Id.* at ¶¶ 27, 34).

In late 2016, through funds provided by Mr. Sciore, SSN purchased Philadelphia's leading Spanish-language radio station, La Mega, which had been servicing its listeners for the past two decades. (*Id.* at ¶ 23). Mr. Sciore's goal in acquiring La Mega was to air the Spanish-language radio broadcasts of Philadelphia Eagles games that SSN had been assigned the rights to produce. (*Id.* at ¶ 24). For the 2016 to 2018 seasons, La Mega, and other radio stations owned by Mr. Sciore, aired Spanish-language radio broadcasts produced by SSN. (*Id.* at ¶ 29).

Throughout 2017 and 2018, Mr. Kulik allegedly conspired with Ray Devine to usurp SSN's of its broadcast production and Spanish sports radio rights to Eagles games by undermining Mr. Sciore business acumen and SSN's radio services in the minds of the Eagles'

marketing team. (*Id.* at ¶ 2). Manifestations of this alleged conspiracy appeared as early as

October of 2017. (*Id.* at ¶ 45).

Specifically, on October 17, 2017, Mr. Kulik, acting on behalf and in the interests of

Spanish Football Network, emailed the Vice President of Marketing for the Eagles, Brian

Papson, stating:

> [I] gave Michael Sciore you[r] email . . . as we discussed, I would appreciate you saying
> a) you are comfortable with the relationship you and I have built the past 6 years and you
> insist I be included in any meetings. And b) if he wants to discuss any sort of extension
> for [broadcast] rights . . . that you need to address other initiatives and English rights
> before you address [the] Spanish contract. You expect to discuss [the] Spanish [contract]
> sometime next spring.

(*Id.* at ¶ 45). Mr. Papson later echoed these same directives in an email to Mr. Sciore. (*Id.* at ¶

46). Twelve days later, Mr. Kulik, again acting on behalf of and in the interests of Spanish

Football Network, emailed Mr. Papson expressing his concerns about an upcoming meeting with

Mr. Sciore:

> Brian[,]
>
> Wanted to see if you wanted to chat or exchange [a] few emails before our meeting on
> Wednesday with Michael Sciore. . . . Perhaps you will get a better feel for him and his
> business style than I do. But [as] I have previously stated I am concerned with [the]
> direction[] we have been going lately. He is learning the radio business fast but has much
> to learn . . . especially on the sports side of things.
> He will talk in many generalities. His mission will be [to] tell you what [a] great job he
> has done building this network (which in some ways is true) and he will talk of the
> potential to generate lots of income for everyone with little to no specifics.
>
> My worries are (in no particular order):
>
> 1) I have told him you were[] [not] making any decisions on [the] Spanish rights [until]
>    you resolved things on [the] English end. He may try to force you to make a decision
>    quickly saying he needs to plan for 2018.
> 2) He . . . might want to talk about partnerships with [the] Eagles. But [will not] have
>    any specifics as to what he can bring to [the] table. And certainly does [not]
>    understand [the] complexity of stuff like [the] right[] to have a presence in [a]
>    stadium or [a] parking lot with his client.

(*Id.* at ¶ 47).

Further signs of this alleged conspiracy appeared in June of 2018, when the Eagles withdrew a contract offer made to SSN and then later entered into an agreement with Spanish Football Productions for it to produce and broadcast Spanish-language Eagles games. (*Id.* at ¶ 42–43). Then, on July 18, Mr. Kulik's employment with SSN as broadcaster and President was effectively terminated when Mr. Sciore initiated a buy-out of his interest in the company. (*Id.* at ¶ 35). This left Mr. Sciore as the sole member and owner of SSN. (*Id.*).

On August 20, the Philadelphia Eagles contacted Mr. Sciore and Kulik regarding the broadcast of Eagles games for the 2018–2019 seasons and urged the parties to resolve their dispute. (*Id.* at ¶ 36). Shortly thereafter, Mr. Sciore and Mr. Kulik entered into a settlement agreement.[1] (*Id.* at ¶ 37). The substance of the agreement provided that Mr. Kulik, and any entity in which he had an interest in or control over, would air the broadcasts of the Eagles games for the 2018 to 2025 seasons on radio stations owned by Mr. Sciore. (*Id.* at ¶ 38).

On November 7, 2018, Mr. Kulik emailed Mr. Papson indicating that SSN's radio station, La Mega, had failed to air a portion of the October 28 Eagles game. (*Id.* at ¶ 74). A representative of Spanish Beisbol Productions doubled down on this accusation claiming that SSN "simply forgot" to air the game and that Mr. Sciore often goes short staffed or has unmanned stations. (*Id.* at ¶ 76). Spanish Beisbol Productions and its representatives allegedly spoke with the Eagles on November 8, 2018 and repeated these accusations. (*Id.* at ¶ 78). Mr. Sciore emailed the Eagles rebutting these accusations and provided them with affidavits from SSN representatives stating that the subject game was aired in its entirety. (*Id.* at ¶ 80).

---

[1] The Court is unsure on what date the settlement agreement was actually entered into. Plaintiffs state it was August 28, 2018. (*Id.* at ¶ 37). However, the agreement itself is dated and signed August 24, 2018. Plaintiffs also allege that on August 21, 2018, Mr. Sciore and Mr. Kulik worked out an agreement. (*Id.* at ¶ 71).

In December, Mr. Devine solicited a third-party radio station broker and in doing so, identified himself as a "partner" with Spanish Beisbol Productions. (*Id.* at ¶ 83). He claimed that his company "broadcasts . . . the Philadelphia Eagles in Spanish" and was "looking to purchase [their] own flagship station to handle [this] task." (*Id.* at ¶ 83). Mr. Devine was aware that the settlement agreement prohibited Mr. Kulik from broadcasting the Eagles in Spanish on any station not owned by Mr. Sciore. (*Id.* at ¶ 84). Despite this, Mr. Kulik allegedly aired Eagles games on stations not owned by Mr. Sciore. (*Id.* at ¶ 87).

In a further attempt to erode Spanish Sports Network and La Mega's influence over the Spanish-language radio broadcast market, Spanish Sports Production advertised on its website that it was the flagship radio station for Eagles Spanish Radio and "the only source of Phillies and Eagles coverage in Espanol." (*Id.* at ¶ 88). It also employed a similar logo to SSN's design mark:





(*Id.* at ¶ 89).

### B.  Procedural History

On June 17, 2020, Plaintiffs filed suit against Spanish Sports Production, LLC, Spanish Beisbol Productions, LLC, Spanish Football Productions, LLC, William Kulik, and Raymond

Devine asserting claims for false advertising under the Lanham Act, common law unfair competition, unfair and deceptive trade practices under the New Jersey Consumer Fraud Act, defamation, tortious interference with contract, aiding and abetting breach of contract, and tortious interference with prospective contractual relations. (*Id.* at ¶¶ 93–127). Defendant Devine filed an answer on August 19, 2020. (Doc. No. 7). Defendants William Kulik and Spanish Beisbol Productions, LLC, moved to strike certain allegations in the complaint and dismiss Mr. Sciore as Plaintiff. (Doc. No. 19). Defendant Spanish Football Productions, LLC, who had an entry of default entered against it, joined in the motion to strike and dismiss. (Doc. No. 22).

## II.   LEGAL STANDARD

### A.  Motion to Strike Under Federal Rule of Civil Procedure 12(f)

Federal Rule of Civil Procedure 12(f) provides "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "A decision to grant or deny a motion to strike a pleading is vested in the trial court's discretion." *Simmons v. Nationwide Mut. Fire Ins. Co*., 788 F.Supp.2d 404, 407 (W.D.Pa.2011) (citing *Snare & Triest v. Friedman*, 169 F. 1, 6 (3d Cir.1909); *BJC Health System v. Columbia Cas. Co*., 478 F.3d 908, 917 (8th Cir.2007)). "[C]ourts should not tamper with the pleadings unless there is a strong reason for so doing." *Lipsky v. Commonwealth United Corp*., 551 F.2d 887, 893 (2d Cir.1976). "'[E]ven where the challenged material is redundant, immaterial, impertinent, or scandalous, a motion to strike should not be granted unless the presence of the surplusage will prejudice the adverse party.'" *GI Sportz, Inc. v. Valken, Inc*., No. 116CV07170NLHKMW, 2017 WL 2600457, at *2 (D.N.J. June 15, 2017). Therefore, courts must bear in mind that, generally, "motions to strike under Rule 12(f) are highly disfavored." *F.T.C. v. Hope Now Modifications*, LLC, No. 09–1204, 2011 WL 883202, *2 (D.N.J. Mar. 10, 2011).

**B.  Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss an action for failure to state a claim upon which relief can be granted. When evaluating a motion to dismiss, "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). In other words, a complaint survives a motion to dismiss if it contains enough factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

To make this determination, courts conduct a three-part analysis. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the Court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the Court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quoting *Iqbal*, 556 U.S. at 680). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (quoting *Iqbal*, 556 U.S. at 678). Finally, "when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.* (quoting Iqbal, 556 U.S. at 679). A complaint cannot survive a motion to dismiss where a court can only infer that a claim is merely possible rather than plausible. *Id.*

III.   **DISCUSSION**

   **A.  Motion to Strike**

Defendants moves to strike paragraphs two through three and twenty-five through seventy-three in the complaint—over fifty allegations in total—as immaterial, impertinent, and scandalous. They contend that the vast majority of the factual allegations in the complaint are impertinent background information subject to a confidential settlement agreement. Plaintiffs maintain the allegations should not be stricken because they are relevant to their claims, Defendant Mr. Kulik—the only Defendant with standing to enforce the settlement agreement— waived enforcement of the agreement by breaching it himself, the allegations have been public record since November of 2018 due to another case involving the same parties, and no Defendant has shown any prejudice.

Although Plaintiffs overstate their case, [2] we agree that Defendants have not shown any prejudice and at least some of the allegations are relevant to Plaintiffs' claims or provide pertinent background. As a general matter, motions to strike under Rule 12(f) are disfavored. *Seidel v. Lee*, 954 F.Supp. 810, 812 (D.Del.1996). "[E]ven where the challenged material is redundant, immaterial, impertinent, or scandalous, a motion to strike should not be granted unless the presence of the surplusage will prejudice the adverse party." *Symbol Techs., Inc. v. Aruba Networks, Inc.*, 609 F.Supp.2d 353, 359 (D.Del.2009) (internal quotations omitted). "'Immaterial matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded.'" *Delaware Health Care, Inc. v. MCD Holding Co.*, 893 F.Supp. 1279, 1291–1292 (D.Del.1995) (quoting 5A Charles A. Wright & Arthur R. Miller, Federal

---

[2] Plaintiffs claim that a complaint in a previous state court action involving the same parties sets forth much of the background that Defendants seek to strike. Unless Plaintiffs are referring to a different complaint or case, they overstate the factual overlap between the two complaints. The state court complaint—which merely spans four pages—contains a total six allegations that are the same or substantially similar to the allegations in the current complaint. Thus, given that Defendants seek to strike over fifty allegations from the current complaint, it is gross overstatement to say that "much" of the background in the current complaint was also set forth in a prior state court complaint. Likewise, if Plaintiffs are referring to this state court case when they assert that these allegations have been public record since 2018, this assertion is also overstated.

Practice and Procedure § 1382, at 706–07 (2d ed.1990)). "'Impertinent matter consists of statements that do not pertain, and are not necessary, to the issues in question.'" *Id.* at 1292. "'Scandalous matter' has been defined as 'that which improperly casts a derogatory light on someone, most typically on a party to the action.'" *Carone v. Whalen*, 121 F.R.D. 231, 233 (M.D.Pa.1988) (citing 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1382, at 826).

In proceeding on a motion to strike for relevancy, the movant must show that the allegations being challenged are so unrelated to the plaintiff's claims as to be unworthy of any consideration and that their presence in the pleadings will be prejudicial. *See River Rd. Dev. Corp. v. Carlson Corp.–Northeast*, 1990 WL 69085, at \*7 (E.D. Pa. May 23, 1990) (the movant "must clearly show that the matter sought to be stricken is outside the issues in the case and is prejudicial" on a Rule 12(f)(2) motion). Prejudice occurs when the challenged pleading confuses the issues or is so lengthy and complex that it places an undue burden on the responding party. *See, e.g., Goode v. LexisNexis Risk & Information Analytics Grp, Inc.*, 284 F.R.D. 238, 243 (E.D. Pa. 2012) (citing *River Rd.*, 1990 WL 69085, at \*2).

Defendants have not explained how the allegations they seek to strike are prejudicial. They do not argue that the allegations risk confusing the issues in this case nor assert that the complaint is so lengthy and complex that it places an undue burden on them. Indeed, even if these arguments were present, we would be hard-pressed to accept them at face value when Defendants' motion to dismiss shows they understand the nature of the claims asserted against them. Thus, for this reason alone, we would deny the motion to strike. *Am. Power, LLC v. Speedco.*, Inc., No. 1:15-CV-2091, 2016 WL 6563671, at \*2 (M.D. Pa. Nov. 4, 2016) (denying a motion to strike, in part, because there was no explanation how the assertions in the pleadings

were unfairly prejudicial); *Berezansky v. CBN Bank*, No. 3:17-CV-105, 2018 WL 461245, at *3 (W.D. Pa. Jan. 17, 2018) (declining to grant a motion to strike because there was no prejudice).

But we will also deny Defendants' motion to strike because at least some of Plaintiffs' claims are premised on the allegations Defendants seek to strike. For instance, Plaintiffs' tortious interference with prospective contractual relations claim is premised on Mr. Kulik's email to Mr. Papson on October 29, 2017—approximately ten months prior to the Settlement Agreement—in which he indicated that Mr. Sciore did not understand the complexity of broadcasting rights nor the economics of his broadcasting proposal to the Eagles. Whether this claim was released by the settlement agreement, or is perhaps barred by the statute of limitations, is not before this Court. But what is absolutely clear is that some of these allegations are relevant to Plaintiffs' tortious interference claim and cannot be stricken.

Lastly, these allegations do not rise to the level of a scandalous matter. The allegations do not use any repulsive language or detract from the dignity of the Court. The only way it could be said that they cast a derogatory light on Defendants is by contending that they acted illegally, but that is the very basis of Plaintiffs' claims. *Brkovich v. Dynacom Indus., Inc*., No. CIV.A. 3:11-46, 2011 WL 7052128, at *3 (W.D. Pa. Nov. 10, 2011) (finding allegations that the defendant acted illegally was not scandalous as that was the basis of the plaintiff's FLSA claim). And to the extent that Plaintiffs' claims are not premised on these allegations, they provide useful background information regarding the parties' prior relationship which is relevant to the present dispute. Therefore, Defendants' motion to strike is denied.[3] *10x Genomics, Inc. v. Celsee, Inc*., No. CV 19-862-CFC-SRF, 2019 WL 5595666, at *3 (D. Del. Oct. 30, 2019), report and recommendation adopted, No. CV 19-862-CFC/SRF, 2019 WL 6037558 (D. Del. Nov. 14, 2019)

---

[3] The parties do not seek to enforce the settlement agreement and therefore we need not decide whether Defendants can enforce it.

(noting courts routinely decline to strike factual background information at the motion to dismiss stage when they are related to the subject matter of the litigation).

### B.  Motion to Dismiss

Defendants argue that Plaintiff Mr. Sciore must be dismissed as a party to this lawsuit because he does not have standing to assert any of his claims. There is some merit to this contention.

### i.   Count One: False Advertising and Promotion in Violation of 15 U.S.C. § 1125(a)(1)(B)

Plaintiffs claim Defendants have violated Section 1125(a)(1)(B) of the Lanham Act by falsely advertising that they are the flagship radio station for Eagles Spanish Radio and the only source of radio coverage for Spanish-language Phillies and Eagles games. According to Plaintiffs, these statements are false or misleading because Spanish Sports Productions is not the flagship radio station for Eagles Spanish Radio, La Mega is, and Mr. Sciore's radio stations provide other sources of coverage for Spanish-language Phillies and Eagles games.[4] Despite there being allegations that Mr. Sciore independently owns radio stations and therefore competes with them, Defendants somehow contend he has no commercial interest redressable under the Lanham Act. They assert that his interest, if any, is merely derivative of SSN's commercial interest and consequently he cannot satisfy the proximate cause requirement for statutory

---

[4] We would be remiss if we did not note that this is our *limited* understanding of Plaintiffs' theory. We emphasize "limited" because Plaintiffs' theory is altogether not clear. The caption in Plaintiff's complaint states "Defendants SSP and Kulik falsely advertises that SSP is the flag ship station of Eagles' games." This would suggest that Plaintiffs are proceeding under a literally false theory. However, Plaintiffs then allege that the advertisements were misleading, suggesting that they may be invoking the literally true theory. *Telebrands Corp. v. Ragner Tech. Corp*., No. CV163474ESMAH, 2019 WL 1468156, at *4 (D.N.J. Apr. 3, 2019). Or perhaps Plaintiffs are pursuing both theories. What should be clear from this digression is that Plaintiffs' theory is not clear. To quote Judge Posner, "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). We should not have to guess as to which theory Plaintiffs are asserting. Indeed, that is the very essence of *notice* pleading.

standing under the Lanham Act.[5] Plaintiffs maintain that Mr. Sciore has a commercial interest redressable under the Lanham Act because he independently owns radio stations that compete with Defendants and the Supreme Court's decision in *Lexmark* clarified that he need not be in direct competition to assert a claim under the Act. We agree with Plaintiffs in part and Defendants in part.

The question before us goes to the scope of the statutory remedy, that is, whether the plaintiff invoking the statute falls within the class of persons sought to be protected by § 1125(a). *Advanced Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 332 (M.D. Pa. 2014), aff'd, 958 F.3d 168 (3d Cir. 2020). Our foray into this area of the law is limited to the proximate cause requirement.

We start with the text of the statute. The Lanham Act provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

---

[5] While the Supreme Court has admitted that its jurisprudence on the zone of interests requirement is not a paragon of clarity, we believe it meant what it said when it placed this test under the rubric of statutory standing, not prudential standing. *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 129 (2014) (noting "prudential standing is a misnomer as applied to the zone-of-interests analysis."). Indeed, the Third Circuit has seemingly endorsed the statutory standing conceptualization. *Marathon Petroleum Corp. v. Sec'y of Fin. for Delaware*, 876 F.3d 481, 492 (3d Cir. 2017) (noting the Supreme Court's decision in Lexmark clarified that the "zone-of-interests analysis is not a constitutional or prudential standing inquiry meant to ensure federal court jurisdiction but is a statutory question to be addressed on the merits."); *see also Maher Terminals, LLC v. Port Auth. of New York & New Jersey*, 805 F.3d 98, 105 (3d Cir. 2015) (agreeing that the zone-of-interests test should not be linked to the doctrine of Article III standing).

15 U.S.C. § 1125(a)(1). As the Supreme Court noted in *Lexmark*, if the language "any person who believes that he or she is likely to be damaged" were read literally, it might suggest an action is available to anyone who can satisfy the minimum requirements of Article III. *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 129 (2014). It rejected such a broad interpretation. Instead, it held that for an individual to maintain an action under the Lanham Act, they must fall within the zone of interest protected by the law and their injuries must be proximately caused by violation of the statute. *Id.* at 129–132.

To satisfy the proximate cause requirement, a "plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising." *Id.* at 133. This "occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* However, this "showing is generally not made when the deception produces injuries to a fellow commercial actor that in turn affect the plaintiff." *Id.* For instance, "while a competitor who is forced out of business by a defendant's false advertising generally will be able to sue for its losses, the same is not true of the competitor's landlord, its electric company, and other commercial parties who suffer merely as a result of the competitor's 'inability to meet [its] financial obligations.'" *Id.*

There are instances, however, where a seemingly derivative harm is actually a direct and independent injury. "Consider two rival carmakers who purchase airbags for their cars from different third-party manufacturers. If the first carmaker, hoping to divert sales from the second, falsely proclaims that the airbags used by the second carmaker are defective, both the second carmaker and its airbag supplier may suffer reputational injury, and their sales may decline as a result. In those circumstances, there is no reason to regard either party's injury as derivative of

the other's; each is directly and independently harmed by the attack on its merchandise." *Id.* at 138–139.

With these principles in mind, we find that Mr. Sciore has sufficiently alleged proximate cause with respect to Defendants allegedly misleading statement that it is the only source of coverage for Spanish language Phillies and Eagles games but not with respect to their statement that they the flagship radio station for Eagles' Spanish Radio.

As alleged, Mr. Sciore appears to be acting in a dual capacity—as the sole managing member of SSN and as an independent owner of several radio stations—the latter of which confers standing. Plaintiffs allege Mr. Sciore is the owner of Spanish Sports Network, which produces and broadcasts Spanish-language Eagles games, and that he is also the owner of several other radio stations throughout the state and country which air SSN's broadcasts.[6] They further allege they have suffered injury to their business and reputations, which they are reliant on to be competitive in the market. Although it is not entirely clear from the Complaint, it appears that Mr. Sciore himself, as opposed to SSN, owns these other radio stations. As their alleged owner, Mr. Sciore would be in direct competition with Defendant Spanish Sports Production which also allegedly owns radio stations that air Spanish language sports games. Therefore, there is a reasonable basis to believe that Mr. Sciore, as a direct competitor, is likely to be damaged by Defendants misleading statement that it was the only source of coverage for Phillies and Eagles games because it will harm his business reputation and eventually lead to a decrease in revenue or profits. *Steer Mach. Tool & Die Corp. v. SS Niles Bottle Stoppers, LLC*, 331 F. Supp. 3d 429,

---

[6] Even this allegation in Plaintiffs' complaint is unclear. Plaintiffs allege "Eagles games ha[ve] aired in Spanish on SSN's La Mega 105.7 and exclusively on other affiliates owned by Mr. Sciore *as part of the Spanish Sports Network*." They further allege that "SSN broadcasted and produced Spanish language broadcasts of Eagles games that aired exclusively on radio stations owned by Mr. Sciore." These allegations are seemingly inconsistent. Are the radio stations owned by Mr. Sciore or by SSN? Perhaps both? It is unclear, however, we construed them in the light most favorable to Plaintiff, hence our holding in his favor.

434 (M.D. Pa. 2018) (finding that an allegation the plaintiff has been and is likely to continue to be injured in its business reputation and lose revenue and profits is sufficient to satisfy proximate cause). Accordingly, we find that Mr. Sciore has statutory standing to assert a claim under the Lanham Act, but only with respect to this misleading statement.

Defendants other misleading statement—that they are the flagship radio station for Eagles Spanish Radio—would only cause a derivative injury to Mr. Sciore. This assertion is only misleading because the alleged flagship radio station for Spanish-language Eagles games is La Mega, which per Plaintiffs own allegations is owned by SSN, not Mr. Sciore. In other words, Defendants misleading statement regarding La Mega produces an injury "to a fellow commercial actor that in turn affect[s] the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133–34 (2014). Therefore, because Mr. Sciore's injury is purely derivative of SSN's injury, he has not sufficiently alleged proximate cause with respect to this misleading statement.

Although Plaintiffs contend they need not be in direct competition with Defendants in order to have statutory standing, *Lexmark*'s holding was more nuanced than this. In *Lexmark*, the Court compared the defendant's disparaging statement that usage of its competitor's microchip was illegal to a statement by a carmaker that its competitor's car had defective airbags. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 138–139 (2014). In both instances, the disparaging statement, even though aimed at a direct competitor, also harmed a third party's reputation—the manufacturer of the microchip and hypothetical airbag supplier— because it disparaged that party's product. *Id.* The same is not true here. As we noted above, La Mega is not Mr. Sciore's "product" or "service," it is SSN's. Therefore, because Mr. Sciore does not stand in the shoes of the hypothetical airbag supplier or manufacturer of microchip, he has

not sufficiently alleged proximate cause. Our conclusion *might* be different if Defendants denigrated the quality of SSN's broadcasts because they air on both La Mega and Mr. Sciore's other radio stations—a fact which would place Mr. Sciore in the shoes of the hypothetical carmaker and SSN, the airbag supplier.[7] However, in the absence of this allegation or something similar,[8] Defendants' disparaging statement directed toward SSN's radio station is simply just that, a harm to SSN only.

### ii.  Common Law Unfair Competition and New Jersey Consumer Fraud Act

Our conclusion that Mr. Sciore has standing to assert a claim under the Lanham Act with respect to one of Defendants' misleading statements resolves the New Jersey common law unfair competition and Consumer Fraud Act claims. First, New Jersey common-law unfair competition claims mirror claims under Section 43(a) of the Lanham Act. *Telebrands Corp. v. Ragner Tech. Corp.*, No. CV163474ESMAH, 2019 WL 1468156, at *5 (D.N.J. Apr. 3, 2019). Therefore, for the same reasons we denied Defendants' motion to dismiss Mr. Sciore under the Lanham Act, their motion to dismiss the unfair competition claim is also denied.

Second, almost by definition, a finding of statutory standing under the Lanham Act forecloses a claim under the NJCFA. In *Lexmark*, the Supreme Court noted that "[a] consumer who is hoodwinked into purchasing a disappointing product may well have an injury-in-fact cognizable under Article III, but he cannot invoke the protection of the Lanham Act—a

---

[7] In a sense, Mr. Sciore's independently owned radio stations are similar to retailers because they both provide a product or service to customers, here the radio broadcasts. This would make SSN, the producer of the radio broadcasts, akin to a manufacturer. Therefore, an allegation directed at Mr. Sciore's other radio stations that denigrated the quality of SSN's broadcasts would be sufficiently analogous to the disparaging statement in *Lexmark*.

[8] The Supreme Court concluded proximate cause was satisfied for another reason as well. Because the microchips sold by Static Control had *no other use* other than refurbishing toner cartridges sold by the remanufacturers, it could conclude that the only cause for a reduction in Static Control's business was a corresponding reduction in the remanufacturers' business. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 139 (2014). Again, there are no allegations suggesting the same 1:1 relationship is present here. Perhaps if the only use for Mr. Sciore's other, independently owned radio stations was to air the same broadcasts as La Mega, our conclusion might be different.

conclusion reached by every Circuit to consider the question." *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 132 (2014). Therefore, by finding that Mr. Sciore and SSN had standing to assert a cause of action under the Lanham Act, they could not be hoodwinked consumers, which is a necessary requirement for standing under the New Jersey Consumer Fraud Act. *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, No. CIV.A. 10-453 FLW, 2010 WL 5239238, at *9–11 (D.N.J. Dec. 16, 2010). Further buttressing this conclusion is the fact that there are no allegations that Mr. Sciore or SSN purchased any products or services for consumption or use in the course of their business from Defendants. Instead, the nature of the conduct seems to be the false or misleading advertisements posted on Defendants' website, a competitive injury not intended to be redressed under this Act. Therefore, we find that neither SSN nor Mr. Sciore has standing to assert a claim under the NJCFA to redress their alleged competitive injury.

Plaintiffs cite to three cases to support their argument that Mr. Sciore and SSN can assert a claim under the NJCFA. This Court is not persuaded. First, the *Feiler* decision did not involve NJCFA claims. *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, No. CIV.A. 10-453 FLW, 2010 WL 5239238, at *10 (D.N.J. Dec. 16, 2010). Second, *Port Liberte Homeowners Ass'n* involved a unique relationship between a condominium association and a developer that allowed the association to step into the developer's shoes when control passed, and therefore the association, through the developer, did engage in a direct consumer transaction. *See Port Liberte Homeowners Ass'n, Inc. v. Sordoni Const. Co*., 393 N.J. Super. 492, 506 (App. Div. 2007). Third, *United Stations* does not support Plaintiffs' contention because the statute analyzed in that opinion had different animating purposes than the CFA—namely, it was intended to prevent "chaotic, destructive competitive practices among retailers." *United Stations*

*of N. J. (US) v. Kingsley*, 99 N.J. Super. 574, 582–84 (Ch. Div. 1968). Therefore, in light of that purpose, it made sense to construe the statute broadly to provide standing to the retailer. But here it does not because the thrust of the NJCFA is intended to protect consumers in the popular sense, not to redress competitive injuries. Therefore, none of these cases persuade this Court to extend standing under the CFA beyond its established contours.

### iii. Count Four: Defamation

Plaintiffs assert a claim of defamation against Defendants Spanish Beisbol Productions and Spanish Sports Productions for the allegedly covert, defamatory statements made to the Philadelphia Eagles' representative in Philadelphia. Defendants contend that there are no facts which would support such a claim made by Mr. Sciore and even if such facts did exist, this claim is barred by the one-year statute of limitations. Plaintiffs contend the statute of limitations does not bar the defamation claim because the discovery rule applies, and the statute of limitations defense does not apply because it is unclear from the face of the complaint when Mr. Sciore learned of the defamation statement. Plaintiffs' arguments hinge on the choice of law issue.

In a case based on federal question jurisdiction where a court is exercising supplemental jurisdiction over state law claims, the federal court applies the choice of law rules of the forum state. *Knechtel v. Choicepoint, Inc.*, No. CIV.08-5018(RBK/KMW), 2009 WL 4123275, at *5 (D.N.J. Nov. 23, 2009). Choice of law questions under New Jersey law require a court to apply the two-step "governmental-interests analysis." *Rowe v. Hoffman–La Roche, Inc.*, 189 N.J. 615, 917 A.2d 767, 771 (N.J.2007).

The first prong of the analysis requires courts to examine the substance of the potentially applicable laws to determine if an actual conflict exists. *Id.* (citing *Lebegern v. Forman*, 471 F.3d 424, 430 (3d Cir.2006)). If there is no actual conflict, the analysis ends and the law of the forum

state applies. *See Rowe v. Hoffman–La Roche, Inc*., 189 N.J. 615, 621 (2007). If a conflict does

exist, the court must then determine which jurisdiction has the "most significant relationship" to

the claim. *Camp Jaycee*, 197 N.J. at 136, 962 A.2d 453; *Grossbaum v. Genesis Genetics Inst*.,

*LLC*, 489 Fed.App'x. 613, 616 (3d Cir.2012) (noting that "[i]f an 'actual conflict' exists between

the laws of jurisdictions with ties to a case, New Jersey applies the 'most significant relationship'

test set forth in the Restatement (Second) of Conflict of Laws").

There is no question that there is an actual conflict between the laws of Pennsylvania and

New Jersey. The discovery rule does not apply in New Jersey while it does in Pennsylvania.

*Compare Burr v. Newark Morning Ledger Co*., 2018 WL 1955050, at *2 (N.J. Super. Ct. App.

Div. Apr. 26, 2018) (holding that "recent unambiguous precedent dictates" that the discovery

rule is inapplicable to defamation claims); *with Brown v. DaVita Inc*., No. CIV.A. 09-3892, 2011

WL 5523823, at *4 (E.D. Pa. Nov. 14, 2011) (explaining "the discovery rule applies and the

statute of limitations is tolled when the alleged defamatory statements were uttered in a context

in which the plaintiff could not have known about them.").

The next step is to determine the interest that each state has in resolving the specific issue

in dispute. Under New Jersey choice of law rules for defamation, if a defamatory communication

is published in one state, that state's law will apply. *Givaudan Fragrances Corp. v. Krivda*, No.

CIV.A.08CV4409PGS, 2009 WL 3068285, at *5 (D.N.J. Sept. 22, 2009). Therefore, because the

alleged defamatory statement was published in Philadelphia, we agree with Plaintiffs that

Pennsylvania law applies.

Similarly, Plaintiffs are correct that it is unclear from the face of the Complaint when Mr.

Sciore learned of some of these defamatory statements. However, this does not hold true for all

statements. Plaintiffs allege that defamatory statement occurred on November 7, 2018, when

SBP falsely stated to the Eagles that SSN failed to air a portion of the Eagles game. Mr. Sciore learned of this statement, at the latest, on November 27, 2018 when he provided affidavits to the Eagles declaring and confirming that the subject game was aired in its entirety. Therefore, Plaintiffs had one year from this date to bring a claim for defamation based on this particular publication. The complaint was not filed until June 17, 2020, clearly outside of the one-year mark. Therefore, this particular publication is barred by the statute of limitations.

Although Plaintiffs allege SBP continued to malign SSN and Mr. Sciore in the eyes of the Eagles brass, this is a separate publication of a defamatory statement and therefore subject to a separate one-year time bar. *McClenaghan v. Turi*, 567 F. App'x 150, 154 (3d Cir. 2014) (noting "the publication of each communication constitutes a separate, potentially-tortious act, governed by its own statute of limitations."). Moreover, to the extent it can be inferred that this continued disparagement of SSN and Mr. Sciore involved the same statements, there is no continuing violations doctrine that would toll the statute of limitations for defamation claims. *Porta v. Fee*, No. CIV. A. 98-2094, 1998 WL 334355, at *1 (E.D. Pa. June 24, 1998). Therefore, the alleged defamatory statements that occurred on November 7, 2018 are time barred by the 1-year statute of limitation. However, when Plaintiffs learned of this continued disparagement is not clear from the face of the complaint and consequently Defendants cannot invoke the affirmative defense with respect to this defamatory statement.

### iv. Counts Five, Six, and Seven: Tortious Interference with Contractual Relations, Aiding and Abetting Breach of Contract, and Tortious Interference with Prospective Contractual Relations

As a threshold matter, both parties have skipped a necessary analytic step by failing to address the choice of law issue that may be dispositive of the aiding and abetting breach of

contract claim. Therefore, we will deny Defendants' motion to dismiss Mr. Sciore with respect to the aiding and abetting the breach of contract claim because they failed to address the choice of law issue. Defendants may raise this issue through proper briefing in a later appropriate motion. *Taylor v. JVC Americas Corp.*, No. CIV. 07-4059(FSH), 2008 WL 2242451, at *4 (D.N.J. May 30, 2008). We will address Plaintiffs' tortious interference claims, however, because there is no actual conflict between the laws of New Jersey and Pennsylvania. *Ciecka v. Rosen*, 908 F. Supp. 2d 545, 556 (D.N.J. 2012).

Plaintiffs assert two tortious interference claims. The first is a tortious interference with contractual relations claim against Spanish Football Productions and Spanish Sports Productions because these two entities allegedly caused Mr. Kulik to breach his 2018 Settlement Agreement by airing Eagles Games on his own network and radio stations instead of Mr. Sciore's stations. The second is a tortious interference with prospective contractual relations claim against Spanish Beisbol Productions and Spanish Sports Productions because their allegedly false statements about Plaintiffs' services and Mr. Sciore's inability to understanding the complexity of the radio broadcast market caused the Eagles to withdraw a contract offer to Plaintiffs. Defendants contend Mr. Sciore does not have standing to assert either of these claims because the contractual relationships described in the Complaint were maintained by SSN, Mr. Sciore. We disagree.

The elements for a tortious interference claim are the same for both Pennsylvania and New Jersey: (1) the existence of a prospective economic or contractual relationship between the plaintiff and a third party, (2) intentional harm to the plaintiff by the defendant, (3) the absence of a justification for the defendant's conduct, and (4) the interference must cause some damage. *Ciecka v. Rosen*, 908 F. Supp. 2d 545, 556 (D.N.J. 2012). Defendants only challenge the first element of this claim.

21

Whatever the merits of Plaintiffs' first tortious interference claim, Defendants' argument is clearly wrong. Defendants attached the 2018 settlement agreement to their motion and the very first line of said agreement lists the parties involved: *Michael Sciore*, Spanish Sports Network, LLC, and William Kulik. The Court is befuddled by Defendants' argument that Mr. Sciore did not have a contractual relationship when the very exhibit attached by Defendants clearly contradicts this. Moreover, the Complaint clearly states "[o]n August 28, 2018, *Mr. Sciore*, SSN, and Kulik entered into a Settlement Agreement." Plaintiffs likewise allege that "[d]uring the 2018-2019 season and . . . the 2019-2020 season, in violation of SSN and Kulik's 2018 Contract to be the exclusive radio stations for Eagles' Spanish Radio, 'Spanish Sports Productions' induced Kulik to breach his agreement with SSN *and Mr. Sciore* by airing Kulik-produced Eagles games on their own network." Thus, it is crystal clear that Defendants' argument is unsupported by the facts.

Defendants second argument is a closer call but construing the Complaint in the light most favorable to Plaintiffs, they have made out a plausible claim for relief that Defendants tortiously interfered with the prospective contractual relations between Mr. Sciore and the Eagles. Plaintiffs allege the Eagles withdrew a contract offer made to *Plaintffs* and that the offer sought to expand the broadcast of Spanish-language Eagles games to other stations owned by Mr. Sciore. This is enough for this Court to conclude that Mr. Sciore has standing to assert this claim. *Printing Mart-Morristown v. Sharp Elecs. Corp*., 116 N.J. 739, 755, 563 A.2d 31, 39 (1989) (concluding an invitation to bid constituted a prospective economic relation); *Phillips v. Selig*, 2008 PA Super 244, 959 A.2d 420, 428 (2008) (explaining a prospective contractual relationship requires "something less than a contractual right, [but] something more than a mere

hope."). Therefore, Defendants motion to dismiss Mr. Sciore as a party for lack of standing is denied.

## IV.     CONCLUSION

For the reasons set forth above, Defendants' motion to strike is denied and their motion to dismiss is granted in part. An order follows.

Dated: <u>5/31/21</u>                                                                    <u>/s/ Robert B. Kugler</u>
                                                                                         ROBERT B. KUGLER
                                                                                         United States District Judge